IC55skiC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SKIDDIES, INC.,

                    Plaintiff,                    New York, N.Y.

            v.                                    16 Civ. 8709 (BCM)

SELDAT, INC., et al.,

                    Defendants.

------------------------------x

                                                  December 5, 2018
                                                  10:15 a.m.

Before:

                    HON. BARBARA C. MOSES,

                                                  Magistrate Judge


                            APPEARANCES


SACK & SACK, LLP
        Attorneys for Plaintiffs
BY:  MICHAEL H. MUI
BY:   ERIC STERN


MODELINE FENELON
        Attorney for Defendants

IC55skiC                              conference

1          (Case called)

2          MR. MUI:  Michael Mui, Sack & Sack.  Good morning,

3     your Honor.

4          THE COURT:  Good morning.

5          MR. STERN:  Eric Stern, Sack & Sack with Michael Mui.

6          THE COURT:  Good morning.

7          MS. FENELON:  Modeline Fenelon, general counsel for

8     Seldat, 28 West 37th Street, New York, New York.

9          THE COURT:  Good morning.

10         MS. FENELON:  Good morning.

11         THE COURT:  Counsel, as you know, we are here this

12    morning for our final pretrial conference.  The matter will be

13    called for trial without a jury on December 12th, next

14    Wednesday, at 9:30 in the morning.  The purpose of today's

15    conference is to review the parties' pretrial filings, to

16    resolve any scheduling or evidentiary issues that can be

17    resolved in advance, and of course to make sure that all of the

18    attorneys understand what is expected of them and of their

19    clients, both prior to and during the trial itself.

20         Excuse me one moment.

21         (pause)

22         THE COURT:  Beginning with the parties' filings, I

23    have the revised joint pretrial order.  Does it remain

24    satisfactory to both parties?

25         MR. MUI:  Judge, I just want to point out that the

1    deposition designations made by defendants is basically a

2    wholesale designation of the entire transcript.

3              THE COURT:  I have read through it, counsel.

4              MR. MUI:  That's it.

5              THE COURT:  Does any party wish to make any changes or

6    modifications to their own portion, or their own as set forth

7    in the pretrial order?

8              MR. MUI:  No, your Honor.

9              MS. FENELON:  No, your Honor.

10             THE COURT:  Give me one minute.

11             I also have five direct testimony affidavits.  That's

12   the complete set, correct, and everybody is happy with their

13   direct testimony affidavits?

14             MR. MUI:  Yes, your Honor.

15             MS. FENELON:  Yes.

16             THE COURT:  I have received no motions *in limine*, the

17   time for such motions having come and gone.  I just want to

18   make sure I didn't miss anything.  Nobody filed any, correct?

19             MR. MUI:  That's correct, Judge.

20             MS. FENELON:  No.

21             THE COURT:  And I have two sets of proposed findings

22   of fact and conclusions of law for which I thank you.  The

23   remaining parties, as I understand it, are for the plaintiffs

24   are Skiddies, Inc., Mr. Franco, and among the defendants we

25   have Seldat, Inc., Seldat Distribution, Inc., California,

IC55skiC                        conference

1    Seldat Distribution, Inc., New Jersey, and Mr -- help me

2    pronounce his name?

3            MS. FENELON:  Daniel Dadoun.

4            THE COURT:  -- Mr. Dadoun; the remaining defendants,

5    having been dismissed after the plaintiffs advised me that they

6    were not pursuing claims against them.  I guess they may not

7    even exist.  I'm not sure what the story is there.

8            So, those are our remaining parties.  And in terms of

9    the claims and counterclaims, the plaintiffs have withdrawn

10   their fourth cause of action and the defendants have withdrawn

11   their third counterclaim.

12           Are we all on the same page?

13           MS. FENELON:  Yes.

14           MR. MUI:  Yes.

15           THE COURT:  I would like to spend some time with you

16   this morning talking first about the witnesses which are listed

17   in the joint pretrial order.  I will assume, unless you tell me

18   otherwise, that each party is planning to call each of the

19   witnesses that are listed in the JPTO, right?  They're all

20   going to be here, correct?

21           MR. MUI:  Yes.

22           THE COURT:  For plaintiff?

23           MS. FENELON:  Yes.

24           THE COURT:  All your named witnesses will be here?

25           MR. MUI:  Judge, the only scheduling issue, I don't

IC55skiC                        conference

 1   know if you want to discuss.

 2           THE COURT:  Not yet.  First tell me if they're going

 3   to be in my courtroom next week.

 4           MR. MUI:  Yes, Judge.

 5           THE COURT:  For defendants as well?

 6           MS. FENELON:  Yes.

 7           THE COURT:  Which means that the opposing party, which

 8   wishes to cross-examine these witnesses, need not issue a trial

 9   subpoena, correct?  They're going to be here.

10           MR. MUI:  Correct.

11           THE COURT:  They're going to be here?

12           MS. FENELON:  Yes.

13           THE COURT:  If I should find that some witness, who

14   the other side expect to cross-examine has not shown up, there

15   will be consequences for that.  If any difficulty should arise

16   with respect to any of the witnesses that you expect, please

17   let me know the instant the issue makes itself known to you.

18           In terms of witness testimony, witnesses whose direct

19   testimony was submitted by affidavit, which in this case is all

20   of the witnesses with the exception of Mr. Franco in his

21   capacity as a defense adverse witness, but in every other

22   instance, these witnesses will not be permitted to offer

23   additional direct testimony from the stand.  What that means is

24   when you call your witness you are limited, once he is sworn

25   in, to confirming his name and the authenticity of his original

1    affidavit which you should offer into evidence at that time.

2    You may then ask the witness to confirm that everything he said

3    in his affidavit is true and correct.  That's pretty much it.

4    You will then tender the witness for cross-examination.

5    Anything else you want to elicit from your witness will have to

6    await redirect and redirect will, of course, be governed by the

7    usual rule, namely that the redirect examination will be

8    limited by the scope of the cross-examination.

9            I do want to address specifically the situation of

10   Mr. Franco who is listed as -- who is a plaintiff, who is a

11   plaintiff's witness, who has submitted an affidavit

12   constituting his direct testimony in support of plaintiff's

13   case-in-chief but who is also listed as an adverse witness for

14   the defendants.  I see no reason, particularly in a bench

15   trial, to call anyone to the stand more than once.  Therefore,

16   in the case of Mr. Franco, I will both permit and expect

17   Defense counsel to conduct his cross-examination and his

18   adverse witness direct examination in the same session.  The

19   plaintiff may then conduct redirect as to its case-in-chief and

20   cross-examination as to the counterclaims and, if appropriate,

21   I will then give the defendant one more turn to conduct

22   redirect as to the counterclaims.

23           So, we may go back and forth four times with respect

24   to Mr. Franco because he is testifying in a dual role,

25   so-to-speak.  I would like to get preliminary estimates, if the

IC55skiC                      conference

1    parties are able to give them to me today, as to how much time

2    they think they are going to require really starting with the

3    defendant, because we are talking cross-examination time now.

4            So, you will be cross-examining three witnesses,

5    correct?  What's your time estimate?

6            MS. FENELON:  Bear with me, your Honor?

7            THE COURT:  Sure.

8            MS. FENELON:  Is it three witnesses or only two?

9            THE COURT:  Maybe it is only two, Franco and Hannon,

10   right?

11           MS. FENELON:  Yes.

12           THE COURT:  I misspoke.

13           MS. FENELON:  Your Honor, I am still thinking about

14   the time frame but I don't think it should be more than three

15   hours.

16           THE COURT:  Three hours per?

17           MS. FENELON:  Two hours per.

18           THE COURT:  Two hours per.  All right.  So that's four

19   hours of cross-examination time.

20           And plaintiff's counsel, you have three defense

21   witnesses to cross-examine.

22           MR. MUI:  Yes.

23           THE COURT:  Any estimate?

24           MR. MUI:  I think Mr. Dadoun would be two, three

25   hours, and I think the other two would be no more than an hour.

IC55skiC                          conference

1              THE COURT:  So, sounds like a maximum of five hours.

2              MR. MUI:  Right.

3              THE COURT:  So that's a total of approximately nine

4     hours of cross-examination.  I'm going to add in a little bit

5     of padding on that for redirect and it sounds like we should be

6     able to get the testimony done in two days.

7              Do you agree, plaintiffs?

8              MR. MUI:  Yes, your Honor.

9              THE COURT:  Defendants?

10             MS. FENELON:  Yes.

11             THE COURT:  Do I need to give each side a time limit

12    in order to make sure that we get done within those two days?

13             MR. MUI:  I don't think that's necessary for us.

14             THE COURT:  Defense?

15             MS. FENELON:  No.

16             THE COURT:  If I see the cross-examination or the

17    redirect examination going substantially beyond the estimates

18    that I heard today, I may have to reconsider that.  So, I know

19    you will do your best to be as efficient as possible.

20             Now, counsel, you said that there was a scheduling

21    issue as to one witness?

22             MR. MUI:  Right.

23             THE COURT:  Now is the time to bring that up.

24             MR. MUI:  I have been in contact with Mr. Hannon.  Is

25    he going to be out of the country next week and the week after.

IC55skiC                          conference

1    He said his first availability to be in New York would be the

2    first week of January.

3              THE COURT:  The trial will be over before the first

4    week of January.

5              MR. MUI:  I understand that, Judge.

6              THE COURT:  We scheduled this trial months ago.  We

7    rescheduled this trial at whose request was it?

8              MS. FENELON:  Ours.

9              THE COURT:  At the defendant's request.  If Mr. Hannon

10   is not available to come to court and be cross-examined then

11   his direct testimony will not be admitted and he will not be a

12   part of the evidentiary record adduced at this trial.

13             Why can't you get him here?

14             MR. MUI:  He is going to be out of the country

15   traveling, Judge.

16             THE COURT:  Why didn't you find that out when we were

17   scheduling the trial?

18             MR. MUI:  I reached out to him.  I received no

19   indication that he wouldn't be available.  After we submitted

20   the pretrial order I reached out to him again and he said he

21   may be away, and then I got confirmation that he was going to

22   be away out of the country.

23             THE COURT:  Well, you are out of luck, sir.  So that

24   brings us down to a total of four witnesses so we definitely

25   ought to get the trial done in two days.

IC55skiC                        conference

1              Any other scheduling issues with witnesses?

2              MS. FENELON:  None, Judge.

3              THE COURT:  Plaintiff?

4              MR. MUI:  No, Judge.

5              THE COURT:  Of the remaining witnesses, looking at the

6    defendant witnesses here, it is Hunt, Cooper and Dadoun, are

7    they all party affiliated witnesses?  I can't remember.

8    Seldat, Seldat, Seldat.  So, there are no non-party witnesses

9    so there will not be an application to exclude witnesses from

10   the courtroom, correct?

11             MR. MUI:  Correct.

12             MS. FENELON:  Correct.

13             THE COURT:  So they can all sit in, as far as that

14   goes.  They may not be interested in sitting in but there

15   doesn't seem to be a prohibition on it.

16             Let me turn to the question of exhibits.  I see that

17   there is no objection to most of the proposed exhibits and yet,

18   for reasons that remain mysterious to me, I do not have a

19   stipulation as to never mind admissibility, I don't have the

20   stipulation as to authenticity, in other words the stipulation

21   that would permit the parties to bring copies of e-mails and

22   contracts rather than laboriously going through the

23   foundational drill for each and every piece of paper.

24             *Mr. Witness, do you recognize this document?*

25             *Mr. Witness, is this a true and correct printout of an*

IC55skiC                        conference

*e-mail that you sent on the date and time stated on the paper*

*to the recipients listed on page 1?*

Do we really want to be doing that, counsel, for each

and every exhibit?  I will direct this question to defense

counsel, who I understand was the one unwilling to stipulate.

MS. FENELON:  That issue did not come to my

understanding on stipulation.  I don't believe I discussed that

stipulation.

THE COURT:  That issue didn't come to your

understanding, it must be because you didn't read my orders, in

which I not once, but twice, specifically encouraged the

parties to stipulate to, among other things, authenticity and

admissibility of documents.  For example, at docket no. 153,

which was an order that I issued on October 3rd I wrote:

Surely -- no, I take it back.  In this one I wrote:  The

parties can agree on basic facts underlying this action which I

remain mystified about and surely they can agree on who sent

what relevant e-mails to whom on what date.

But no, counsel?

MS. FENELON:  I didn't read that.  I'm sorry for that.

I would have to go through the e-mails again to make a decision

on that, your Honor.

THE COURT:  Look.  If you are unable to stipulate to,

at a minimum, authenticity, and preferably admissibility as to

the documents that there is no objection to, then you are both

IC55skiC                         conference

1    going to be in technical difficulty because your cases in chief

2    do not get the job done.  Your affidavits constituting your

3    witnesses' direct testimony do not authenticate and therefore

4    are not sufficient to place into evidence any of the relevant

5    documents, not the e-mails, not the contracts, not the

6    invoices, not anything else, as far as I am concerned.

7         So, you could both find yourself in an awkward

8    situation if the other side wanted to play chicken with you

9    where instead of cross-examining there is a motion to dismiss

10   for failure to make a prima facie case.

11        I don't think litigation should be game of gotcha.  I

12   want to get to the merits and I am sure you do, as well.  If

13   you were, for example, to stipulate to the admissibility of all

14   of the exhibits other than the ones for whom objections have

15   been listed in the pretrial order, you would not be conceding

16   materiality, relevance, or probative value.  You would simply

17   be speeding things up so that they could become a part of the

18   record, reserving all objections as to whether they mean what

19   the other side says they mean and whether they help prove the

20   other side's case or not.

21        I will encourage the parties, between now and next

22   Wednesday, to reconsider this issue and I will, in particular,

23   encourage the parties to agree at the outset of the trial, if

24   they are able to do so, that all of the unobjected to exhibits

25   may be admitted, reserving argument concerning relevance,

1    weight, probative value, and so forth.  If you are able to so

2    stipulate, I will admit all of the unobjected to exhibits at

3    the beginning of the trial.  You may then simply use them as

4    you see fit in your cross-examination or in your redirect

5    examination, including arguing, if you wish to do so, that they

6    don't mean what the other side says they mean, or that they

7    don't show what the other side says they show, or so forth and

8    so on.

9            If you don't stipulate to these foundational matters,

10   then every time you pick up a document you are going to have to

11   go through the drill and if it's not an original, if you are

12   not planning on bringing the original -- e-mails don't really

13   have originals but some of the other documents here have

14   originals, you can expect all kinds of annoying evidentiary

15   objections like best evidence rule and where is the original.

16   I don't think we want to try the case on those kinds of issues.

17   I think we want to get to the issues.

18           Any questions?

19           MS. FENELON:  I will consider.

20           THE COURT:  So, I would encourage both sides to

21   seriously consider making some provision for getting the

22   exhibits admitted in a more efficient manner.

23           Is anyone serving trial subpoenas for documents?  I

24   imagine not.

25           MR. MUI:  No, Judge.

1          THE COURT:  All right.

2          So, in terms of the logistics of the exhibits, the

3    joint pretrial order says to bring a binder to the first day of

4    trial.  I'm going to revise that now.  I am going to ask that

5    one day before trial, in other words by next Tuesday, please, I

6    would like each party to provide the opposing party and the

7    Court, delivered directly to chambers -- don't go through the

8    clerk's office -- a tabbed loose-leaf binder containing copies

9    of all of the exhibits listed by that side in the joint

10   pretrial order tabbed, I guess it is, 1, 2, 3, for the

11   plaintiff, A, B, C for the defendant, and I want them pre

12   numbered.  I want them to say on them that this is Plaintiff's

13   1, Plaintiff's 2, Defendant's A, Defendant's B, so that if I

14   take it out of the binder I still know what it is.  And, in

15   fact, the Court will appreciate two copies of the binder, if

16   counsel don't mind, so that my clerk can have one and I can

17   have one up here on the bench.

18         If we are not stipulating to the admission of

19   exhibits, then in addition to what is in the binders, you will

20   have to bring the original or the closest to an original that

21   you have, of each and every exhibit that you plan to move into

22   admission, and we will have to go through them one by one and

23   you will have to lay a foundation and you will have to move the

24   exhibit into evidence and I will have to ask if there are any

25   objections and then, if I say it is in evidence, it is in

IC55skiC                         conference

evidence.  If we have a stipulation, we can all work out of the

binders.

        Clear on that?

        MR. MUI:  Yes, Judge.

        THE COURT:  Okay.

        One more binder, sorry.  I know the binders are

multiplying, but I'm going to be an optimist and assume the

parties are likely to reach a stipulation here in which case we

will need a binder for the witness that can just sit on the

witness stand so you don't have to keep handing exhibits to the

witnesses, you can just say, turn to tab this, or turn to that

tab.

        MR. MUI:  You want that on Tuesday as well?

        THE COURT:  I guess you don't have to bring that one

until Wednesday, but if you are in the binder-making business,

you might as well make them all on the same day so you know

they all have the same things in them.

        MR. MUI:  Understood.

        THE COURT:  Also, if you can find it within you to

cooperate and make a single binder, which contains both

plaintiff's and defense, I think everybody will be happier down

the road.

        Now, the binder should include not just the exhibits,

P1 through P whatever, and Defendant A through defendant

whatever, but they should also include copies of each of the

|    | moving affidavits, each of the direct testimony affidavits, and |
| 1  |  |
| 2  | the designated deposition excerpts. |

Let's talk about deposition excerpts for a moment and
I will now ask defense counsel, under what theory is
Mr. Franco's entire deposition transcript, both admissible over
the hearsay objection which it is because he is a party
opponent, but what makes it relevant?

MS. FENELON:  Your Honor, my deposition is not long at
all, it is about probably 60-something pages, and at the time
that I was drafting the joint order I was still deciding as to
which part exactly that I was going to bring in and, to be
honest, your Honor, and I am still comparing the deposition
transcript over his affidavit and I am in a position to go over
the pages exactly and give a limited amount of numbers as to
what part of the transcript I want to bring into --

THE COURT:  You understand, I trust, Ms. Fenelon, the
difference between using a deposition transcript as evidence as
part of your case-in-chief and using it to impeach?  You don't
need to pre-designate passages that you intend to use to
impeach the witness, you can do that in the traditional
impeachment fashion.  But, if you simply want to proffer
testimony from the deposition transcript as part of your
case-in-chief, then that needs to be pre-designated.

Are you asking me to give you another opportunity to
do that?

IC55skiC                        conference

1          MS. FENELON:  Yes, please.

2          THE COURT:  All right.  This Friday you will serve on

3    opposing counsel and you will file with the Court your proposed

4    deposition excerpts from Mr. Franco's deposition testimony for

5    purposes other than impeachment and the defendants can tell me

6    on the morning of trial whether they have any objections to

7    those excerpts or not.  What I intend to do with respect to

8    unobjected to deposition excerpts does not require counsel to

9    read them into the record or to simply take them since this is

10   a bench trial in written form, and they will then become part

11   of the record and I will review them prior to issuing any

12   findings of fact and conclusions of law.  Okay?

13         MS. FENELON:  Should I deliver this to chambers or --

14         THE COURT:  Let's see.  The joint pretrial, this is

15   really sort of a supplement to the joint pretrial order so I

16   think you can file it on ECF.

17         MS. FENELON:  Okay.

18         THE COURT:  In order to get the ECF staff to take it

19   and to understand what it is you probably want to call it

20   something like a supplement to joint pretrial order to the

21   court and hopefully they will take it.

22         MS. FENELON:  Thank you.

23         THE COURT:  If not, we will figure out some other way

24   of getting it.

25         Does anyone need electronic computers of any sort for

IC55skiC                        conference

1    the computer projectors, overhead, laptop.

2            MR. MUI:  One laptop.

3            THE COURT:  Is that for counsel?

4            MR. MUI:  Just for counsel.

5            THE COURT:  Ms. Fenelon?

6            MS. FENELON:  No.

7            THE COURT:  In order to get permission to bring a

8    laptop into the court all you need to do is fill out a -- what

9    is that form called, Mr. Snell?

10           THE DEPUTY CLERK:  Electronic order.

11           THE COURT:  It is on Magistrate Moses' web page, there

12   is a form of the order.  You submit it to us, I sign it, I

13   don't put it on ECF, I provide it directly to building security

14   staff and you walk in with your laptop.

15           Conduct of trial.  Let's take a few minutes to discuss

16   the conduct of trial.  We are going to start at 9:30 in the

17   morning.  I would like to start at 9:30 both days.  Do either

18   counsel plan to make an opening statement?

19           MR. MUI:  I was going to defer to your Honor if your

20   Honor requires one or prefers not.

21           THE COURT:  I do not require it in a bench trial where

22   I have proposed finding of fact and conclusions of law.  I just

23   assume you call your first witness.

24           MR. MUI:  I don't think it is necessary.

25           THE COURT:  Ms. Fenelon?

IC55skiC                    conference

1              MS. FENELON:  Same.

2              THE COURT:  So, no opening statements, first witness

3      should be ready to testify at 9:30.  We may have a few

4      housekeeping matters first but they shouldn't take very long

5      and we will keep to that schedule on Thursday, and if we need

6      to have a Friday we will keep to that schedule on Friday as

7      well, be here at 9:30.  Testimony will be generally taken for

8      approximately an hour and a half, then we will take a break,

9      then another hour to hour and a half, then we will take a break

10     for lunch.  We will try to make the lunch break begin somewhere

11     between 12:30 and 1:00, but depending on how the testimony is

12     coming in I can't guarantee a specific lunch break time.  And

13     then we will have two sessions again in the afternoon, each

14     lasting roughly an hour or to an hour and a half with a short

15     break in the middle of the afternoon.

16              If at any time during trial some emergency prevents

17     counsel's prompt attendance at 9:30 in the morning and at

18     whatever time a lunch break ends, please immediately call

19     either the courtroom, and I am going to give you the courtroom

20     number, it is 212 -- Kevin, make sure I give them the correct

21     courtroom number -- 805-

22              THE DEPUTY CLERK:  0171.

23              THE COURT:  Ah, 0171.  And if there is no answer in

24     the courtroom, call chambers.  I think you already have the

25     chambers number.

1          If you should discover between now and next Wednesday

2   or at some time during the trial that you will be unable to

3   comply with our schedule, again, let us know right away and not

4   later.

5          Order of witnesses.  You are down to one witness so I

6   guess he is going to be your first, second, third and last

7   witness, correct?

8          MR. MUI:  All of them, Judge.

9          THE COURT:  All right.

10          How about the defendant?  Because you are going to be

11   on that afternoon, I imagine.

12          MS. FENELON:  Yes.  Will I be cross-examining Franco

13   after he -- will you be examining Franco first?

14          THE COURT:  We just went over that, counsel.

15          He will be placed under oath, he will confirm that his

16   affidavit testimony is his and is true and correct, and then he

17   will be turned over to you both for cross-examination and for

18   such adverse examination as you wish to conduct of him in

19   support of your counterclaims.

20          MS. FENELON:  Yes.  I understand that part, your

21   Honor.  Bear with me.

22          Is it, will he be presenting me the witness in the

23   morning, 9:00 a.m.?

24          THE COURT:  9:30.

25          MS. FENELON:  Okay, yes.  That was my question.

IC55skiC                        conference

1          THE COURT:  So, you should be prepared to start

2     cross-examining/examining Mr. Franco at about 9:40 in the

3     morning, I imagine, if we are not delayed.  All right?

4          MS. FENELON:  Okay.

5          THE COURT:  So he perhaps will be done by lunch.

6          Who is your first witness?

7          MS. FENELON:  It would be Dadoun.

8          THE COURT:  Dadoun first?

9          MS. FENELON:  Dadoun first.

10          THE COURT:  Okay.

11          MS. FENELON:  Aaron Hart.

12          THE COURT:  I'm sorry.  Say again?

13          MS. FENELON:  Aaron Hart, and Wesley Cooper.

14          THE COURT:  Cooper last.

15          How many of those will you have available on

16     Wednesday?

17          MS. FENELON:  I can have all of them here if you --

18          THE COURT:  I don't think you are going to need all

19     three.  I think you may need two, though.

20          MS. FENELON:  Okay.

21          THE COURT:  What do plaintiffs think about that?

22          MR. MUI:  I think it is safe for two, Judge.

23          THE COURT:  So, you can, if you wish, just make sure

24     that Mr. Dadoun and Mr. Hunt are available on the afternoon of

25     the 12th and we can reserve Mr. Cooper for the 13th.  We may

IC55skiC                   conference

1    not get through both of them, but better to have them here and

2    not get to them than to not have them here and be looking

3    around at 3:00 in the afternoon and have no witnesses left.

4           If the order of your witnesses changes, counsel, let

5    your opposing counsel and the Court know as soon as you know.

6    We don't want any surprises.  We are not having trial by ambush

7    here.

8           You may question a witness either from counsel table

9    where you are sitting now or from the lectern, if you wish.  If

10   it is necessary to approach the witness or the bench, please

11   request permission from the Court to do so.  Only one counsel

12   may be heard, per side, per witness.  That's an issue for the

13   plaintiffs, I don't think that's an issue for the defendant

14   because you are the trial counsel, correct?

15          MS. FENELON:  I am, but I will be having general

16   counsel here.

17          THE COURT:  That's fine, but will she be participating

18   in the trial or accompanying you?

19          MS. FENELON:  We hadn't planned.  If we were going to

20   do opening statement, but I don't think so, no.

21          THE COURT:  All right, because she's the lawyer who

22   recently made an appearance in the case.

23          MS. FENELON:  Yes.

24          THE COURT:  Tell me now if you want her to play a role

25   as trial counsel.  You don't.

IC55skiC                    conference

1          MS. FENELON:  Yes, please.

2          THE COURT:  You don't need my permission if she is

3     going to be client representative but if she is going to be

4     getting up and talking, tell me now.

5          MS. FENELON:  I would love to leave that open, your

6     Honor.

7          THE COURT:  Well.

8          MS. FENELON:  If it is possible.

9          THE COURT:  Okay.  The rule is one lawyer per witness

10    per side, so the lawyer who does the cross will also do the

11    redirect of that particular witness and will also do any

12    objecting in relation to that witness and so on.

13          Understood?

14          MS. FENELON:  Yes.

15          THE COURT:  All right.

16          Speaking objections are prohibited.  If you object,

17    say the word "objection" followed by one or a very small number

18    of words to indicate the nature of the objection.  For example:

19    "Objection.  Hearsay."  "Objection.  Rule 403."  I don't want

20    to hear a paragraph here because I don't want the witness to be

21    advertently or inadvertently coached as to the nature of

22    counsel's concern.

23          I will not ordinarily hear argument beyond that on an

24    evidentiary issue while the witness is on the stand.  If some

25    unanticipated evidentiary issue comes up that was not raised in

IC55skiC                          conference

1    advance, counsel should ask the Court to excuse the witness

2    while the matter can be argued.  I don't want to argue it at

3    side bar or try to keep our voices to a whisper so that the

4    witness doesn't hear what we are saying or those kinds of

5    things.

6           Persons at counsel table, including counsel and their

7    clients and their witnesses, shall not make gestures, facial

8    expressions, audible comments, or other peanut gallery type

9    responses to the testimony while it is going in.  I make this

10   point in particular because I understand there is a fair degree

11   of personal animosity between the clients in play here and I

12   don't want to see that demonstrated by word or gesture in the

13   courtroom.  I want everybody to behave themselves appropriately

14   for Federal District Court.

15          Questions to the witnesses should not summarize or

16   repeat the witness' prior testimony except to the minimal

17   extent necessary to put the current question in context.

18          None of the witnesses need an interpreter, correct,

19   plaintiffs?

20          MR. MUI:  Correct.

21          THE COURT:  Defendants?

22          MS. FENELON:  Correct.

23          THE COURT:  Both parties wish to close, yes?

24          MR. MUI:  Briefly, yes.

25          THE COURT:  Okay.  So, we will use claims and

IC55skiC                    conference

1    counterclaims here which means I kind of get to pick.  I will

2    have the defendant close first, followed by the plaintiff.  If

3    I permit rebuttal at that point it will be brief and I will

4    permit brief rebuttal closings for both sides limited to any

5    argument that counsel could not reasonably have anticipated

6    that was shared from the opposing side.

7         The requirement of contemporaneous objection will

8    apply to closing arguments.

9         Any chance that this case is going to settle between

10   now and next week and anything I can do to help that process?

11        Plaintiff?

12        MR. MUI:  Judge, I just spoke to Ms. Fenelon before

13   this conference and we did discuss this topic and we thought it

14   would be helpful if, when both of our clients are present, we

15   could have a conversation with you, perhaps, you speaking with

16   the clients.  I think that would be a significant improvement

17   in the client's positions for both sides here.  I'm not sure

18   when your Honor would conduct such a session.  We were

19   thinking, since we had three days blocked off and we didn't

20   think it would take a full three days to do the bench trial,

21   perhaps before we started on Wednesday morning we could take

22   whatever session we could take to see if there was a

23   possibility of that.  I know my client would welcome the

24   opportunity for resolution and I think we are finally at a

25   point where perhaps there is something that can be done here,

IC55skiC                        conference

1  but I think we need or we want your Honor's help with pushing

2  the ball down the hill a little bit.

3          THE COURT:  And recognizing that you have consented to

4  my jurisdiction for all purposes and therefore that I am your

5  trial judge who will enter a final judgment after trial in this

6  matter, you consent to my also acting in the capacity of

7  mediator?

8          MR. MUI:  Absolutely, Judge.

9          THE COURT:  Ms. Fenelon?

10          MS. FENELON:  Yes.

11          THE COURT:  You consent to that as well?

12          MS. FENELON:  Yes.

13          THE COURT:  Well, I wish you would have come to me

14  earlier and we could have scheduled something in that might

15  have a more robust chance of helping the parties out here.

16  But, given that we are down one witness and I think we can

17  comfortably handle the remaining witnesses in two or at most

18  three days, I will if the parties so request, set aside two

19  hours -- two hours on Wednesday morning, from 9:30 to 11:30, to

20  discuss settlement off the record before trial commences.  So,

21  I will now modify the commencement time of trial until 11:30 in

22  the morning, we will not need a court reporter until 11:30, but

23  we will meet in the courtroom at 9:30 to see what we can do

24  settlement-wise.  Your client representative will be

25  Mr. Franco.

IC55skiC                        conference

1            MR. MUI:  Yes, Judge.

2            THE COURT:  Your client representative will be

3     Mr. Dadoun?

4            MS. FENELON:  Yes, Judge.

5            THE COURT:  I will expect you to tell me at the

6     beginning of the settlement conference portion of the day that

7     you have engaged in a good faith bilateral meet and confer

8     effort before you got here, so you should talk to each other at

9     least one more time between now and then, and I will expect you

10    to report to me on what the state of splay, what the current

11    offer is and what the counteroffer is.  I expect you each to

12    make at least one real offer or counteroffer before you get

13    here on Wednesday morning.  At this late date with trial

14    literally going to begin in two hours I may be of assistance as

15    a gap closer but don't expect me to get you from zero to 60 in

16    those two hours.

17           Do you understand what I am telling you?

18           MR. MUI:  Understood, Judge.

19           THE COURT:  I would like to take a little bit of time,

20    and this may actually be helpful to counsel as you talk to your

21    own clients, about settlements to chat with counsel about some

22    of the legal and evidentiary issues in your case.

23           To begin with, are we going to have stipulation that

24    New York Law applies because I see that both sides have cited

25    New York Law in their proposed finding of fact and conclusions

IC55skiC                    conference

1    of law even though many of the events in question and some of

2    the entities in question are or were in New Jersey.

3           Plaintiffs?

4           MR. MUI:  I would stipulate to New York Law.

5           THE COURT:  Defendant?

6           MS. FENELON:  As well, your Honor.

7           THE COURT:  The parties have stipulated to the

8    applicability of New York Law.  That is helpful.  Thank you

9    very much.

10          The plaintiffs' first cause of action is characterized

11   as a verbal agreement with respect to the plaintiff's

12   entitlement to 5 percent of the revenues from new clients and I

13   think 2 percent of the revenues of ongoing clients.

14          MR. MUI:  Yes, Judge.

15          THE COURT:  There actually appears to be a written

16   contract to that effect, the 2012 letter agreement.  Can

17   plaintiff explain to me why you are pleading that as an oral

18   contract claim?

19          MR. MUI:  Judge, it is Mr. Franco's position and that

20   it was outlined his affidavit as well that while he requested a

21   written contract, he never received one.  The employment

22   agreement that was presented as an exhibit or that will be

23   presented as an exhibit, it is his position that, yes, that's

24   his signature on that document, correct, but he did not sign

25   that document.  That's always been his position.  He was never

IC55skiC                         conference

1    presented with that document.

2             THE COURT:  It is his position that someone affixed a

3    facsimile of his signature to the document?

4             MR. MUI:  Correct.

5             THE COURT:  It is fraudulent, in other words?

6             MR. MUI:  Correct.

7             THE COURT:  That's his claim.

8             MR. MUI:  Yes.

9             THE COURT:  That's a strong charge.

10            MR. MUI:  I understand.

11            THE COURT:  What is the evidence for it?

12            MR. MUI:  Other than Mr. Franco saying that he never

13   received that and signed that, that's --

14            THE COURT:  Let me ask you a closely-related question,

15   and potentially more important question.  What is the

16   difference between the written terms of this March 9th, 2012

17   contract and the oral contract that your client alleges?

18            MR. MUI:  I believe, Judge, the language in the

19   employment agreement surrounding when that payment would have

20   been due, the 5 percent, let's say, Mr. Franco's position is

21   that when the clients were billed by Seldat he was entitled to

22   that commission.  I don't believe the agreement says that.

23            THE COURT:  Well, the agreement uses the term "net

24   invoices paid."

25            MR. MUI:  Right.

IC55skiC                    conference

1    THE COURT:  Which I take it means --

2    MR. MUI:  Actively received payment.

3    THE COURT:  -- which I take it means Mr. Franco and

4    his company get their cut when Seldat gets paid and not when

5    the customer is billed.

6    Is that the primary area of disagreement between the

7    parties?

8    MR. MUI:  I believe that's the primary difference,

9    Judge.

10    THE COURT:  What business, in its right mind, would

11    pay commissions before the money is in the bank?  When I was a

12    partner in a law firm and I was on something akin to a

13    commission arrangement I didn't get paid until the clients paid

14    their bills.  I don't know how it works in your law firm, you

15    don't have to tell me, but common sense does play a role here.

16    So, what's the argument going to be?

17    MR. MUI:  His argument is going to be that's what his

18    agreement with Mr. Dadoun was, that it's when clients were

19    billed.  And there were issues with when clients were receiving

20    billings and invoices.  There is testimony from Mr. Dadoun

21    saying that he didn't even start reviewing these invoices and

22    billing until two years later after Mr. Franco began his

23    relationship there.

24    Other than that, Judge, I understand that common sense

25    does come into play here and when I first heard it as well I

IC55skiC                    conference

1  did a double-take but that's his position; that if it wasn't

2  when the payments were supposed to be made or after they were

3  received it was after Seldat billed the client he was entitled

4  to that.

5         THE COURT:  Is there going to be any evidence for this

6  point other than your client's testimony?

7         MR. MUI:  Not that I'm aware of, Judge.

8         THE COURT:  So it is going to be his word against

9  Mr. Dadoun's word and possibly the word of the defendant's

10  other witnesses.  What is the parties' custom and practice

11  going to show?  The party's custom and practice, at least

12  through the time that the relationship is preserved, is going

13  to be that commissions were paid when client funds were

14  received, correct?

15         MR. MUI:  Correct.

16         THE COURT:  Correct.  So understand you are going to

17  have an uphill battle on that claim.

18         MR. MUI:  Understood.

19         THE COURT:  Turning to the defendants, with respect to

20  that contract claim, Ms. Fenelon --

21         MS. FENELON:  Yes.

22         THE COURT:  -- you have, somewhat mysteriously to me,

23  pleaded a number of equitable defenses to the first cause of

24  action which is not an equitable cause of action, it is a

25  contract cause of action so laches, waiver, estoppel, unclean

IC55skiC                    conference

1   hands.  Are these even applicable to a breach of contract claim

2   brought within the statute of limitations?

3              MS. FENELON:  It is moreso to the breach of covenants

4   of clean hands -- breach of covenants of good faith.

5              THE COURT:  Same problem.  That's a quasi contract

6   claim.  So, you should consider whether those defenses are

7   going to do you any good in the context of the contract or the

8   quasi contract claim.  And there is no statute of limitations

9   argument, correct?  There is a long statute of limitations

10  and --

11             MR. MUI:  Not that I'm aware of, Judge.

12             THE COURT:  What's the statute of limitations on an

13  oral contract in New York?

14             MR. MUI:  Six years.

15             THE COURT:  Okay.

16             So, there may not be a statute of limitations defense

17  and, in any event, it hasn't been pleaded and it is not in the

18  findings of fact and conclusions of law so that is water under

19  the bridge.

20             With respect to the breach of covenant claim, can you

21  give me your elevator speech on that, plaintiffs, keeping in

22  mind that, you know, breach of the covenant of good faith and

23  fair dealing is not a substitute for every episode of allegedly

24  substandard performance that doesn't actually breach a term of

25  the contract.  You have to do more than say the defendant

IC55skiC                       conference

1    didn't do a very good job with their side of the contract.  You

2    essentially have to allege conduct which was designed to and

3    had the effect of preventing the plaintiff from enjoying the

4    mutually agreed upon benefits of the contract and how are you

5    going to quite get there?

6         MR. MUI:  Judge, I recognize that the covenant is

7    implied on almost every breach of contract case you have.

8         THE COURT:  And it drops out before verdict in almost

9    every breach of contract case that gets tried.

10        MR. MUI:  I understand.  I believe there are

11   circumstances here that when Mr. Franco agreed to provide

12   services to Seldat through his company, there was that implied

13   covenant of good faith where, after Mr. Franco would provide a

14   client or a customer to Seldat, I think it was implied that

15   Seldat would do or use its best efforts to invoice properly,

16   invoice on time, manage the services, make sure that products

17   didn't go missing, just basic things that --

18        THE COURT:  Does your client allege, and if so can

19   your client prove that Seldat failed to do these things not out

20   of general incompetence or even negligence, but as part and

21   parcel of an intentional effort to deprive the plaintiff of the

22   benefit to the bargain?

23        MR. MUI:  As it goes to the managing of the services,

24   probably not.  I think that is probably more incompetence than

25   anything else.  But, as it turns to perhaps the late invoicing

IC55skiC                          conference

1    of clients which directly affected Mr. Franco's payment of

2    commissions, I think there can be an argument to be made there

3    that the fact that Mr. Dadoun didn't review these invoices and

4    didn't send out invoices for a long period of time that could

5    be argued as a breech of that covenant of good faith.  That

6    goes beyond just incompetence, that might go towards a willful

7    nature.

8            THE COURT:  All right.  Well, we will have to see if

9    there is evidence to support that theory.

10           Do both parties agree, incidentally, that plaintiff's

11   entitlement to commissions ended when the relationship was

12   terminated or does the plaintiff have a claim that he is

13   entitled to residuals, so to speak?

14           MR. MUI:  Judge, I believe he initially had a claim

15   for the residuals but sitting here today, that's also something

16   that moving forward I would move forward on the commissions

17   that were due.

18           THE COURT:  So, your estimate of contract damages,

19   which is, remind me 2-point-something-million dollars, right?

20           MR. MUI:  2.9.

21           THE COURT:  2.9 million dollars.

22           So, in your view, that is simply your client's

23   contractually agreed upon percentage of the charges billed to

24   the customers for which he was entitled to commission during

25   the time that he was on contract with the defendant?

IC55skiC                      conference

1          MR. MUI:  Yes.

2          THE COURT:  And the defendant's position is, I assume,

3    multi-layered; first, that he was entitled to commission only

4    on revenues booked, not -- or I should say bills paid, not

5    bills sent out; and second, there is a dispute as to which

6    clients he was entitled to commission on, at least in one

7    substantial instance.

8          The written letter agreement makes a distinction

9    between new accounts and maintenance accounts.  Do the parties

10   agree on what that distinction means?  In other words, if an

11   account already belonged to Seldat before Mr. Franco came on

12   board, was he entitled to 2 percent on that client along as it

13   remained a client during his tenure.

14         MR. MUI:  Are you talking pursuant to that agreement?

15         THE COURT:  Well, both the oral and the written

16   agreements, the alleged oral and the alleged written

17   agreements, as the party describes them, make this distinction;

18   5 percent on new accounts and 2 percent on maintenance

19   accounts.

20         MR. MUI:  Yes.

21         THE COURT:  I am trying to figure out what the

22   distinction between the two categories of accounts is and if

23   the parties agree on what they are.

24         I will hear from plaintiffs first.

25         MR. MUI:  Right, Judge.

IC55skiC                    conference

1          Plaintiff's position is that it would be entitled to

2    commissions on only accounts that were introduced to Seldat

3    that did not have a prior relationship with Seldat.

4          THE COURT:  And that he got 5 percent on those.

5          MR. MUI:  Right.

6          THE COURT:  So long as they remained accounts or at

7    some point did they toggle over from being new accounts to

8    being maintenance accounts?

9          MR. MUI:  It is our position that it would always be 5

10   percent if he introduced that client to Seldat.

11         THE COURT:  So, what is the point of having a 2

12   percent category?

13         MR. MUI:  The 2 percent that -- Mr. Franco's

14   understanding of the 2 percent wasn't for maintenance of the

15   account, it was for kind of what we discussed earlier, the

16   residuals of a relationship that if the relationship was

17   ended -- and when I say relationship, I mean between

18   Mr. Franco's company and Seldat.

19         THE COURT:  Yes.

20         MR. MUI:  -- he would be entitled to a percentage of 2

21   percent.

22         THE COURT:  Forever?

23         MR. MUI:  Correct.  But that doesn't --

24         THE COURT:  You dropped that portion.

25         MR. MUI:  Right.  The numbers don't include that.

1          THE COURT:  So that makes your claim simple.

2          MR. MUI:  Right.

3          THE COURT:  Your claim is that for every account that

4    was introduced or brought in by Mr. Franco, he was entitled to

5    5 percent of the billings that went to that client through the

6    day the relationship terminated.

7          MR. MUI:  Yes, Judge.

8          THE COURT:  And nothing thereafter.

9          MR. MUI:  Right.

10         THE COURT:  And the defendants take a difference view.

11   Can you give me your elevator speech, Ms. Fenelon?

12         MS. FENELON:  My client is the best to explain it but

13   this is what I understand and it is the culture of the company.

14   The person, the sales person who bring the account in will have

15   the percentage what is in the contract with them.

16         THE COURT:  5 percent.

17         MS. FENELON:  I was talking generally, but in this

18   contract it would be 5 percent.  And then, if there are other

19   accounts that he is maintaining, he gets 2 percent of that.

20         THE COURT:  So he would get then 2 percent on accounts

21   that were already there before he got there?

22         MS. FENELON:  And he is maintaining.

23         THE COURT:  But which he then had to manage.

24         MS. FENELON:  Yes.  That's my understanding.

25         THE COURT:  So he would potentially, under your theory

IC55skiC                    conference

1   of the world, Mr. Franco's company would potentially be

2   entitled to 2 percent commission on accounts he did not

3   originate himself?

4           He was national sales manager, correct?

5           MS. FENELON:  I believe so.

6           THE COURT:  It says that that's his title.

7           MS. FENELON:  I believe so.

8           THE COURT:  Actually, does it say that?

9           MR. MUI:  I think it was just sales manager.

10          THE COURT:  It says:  Your chief responsibility is to

11  lead Seldat's American sales effort so he was the head sales

12  person in America.

13          Did that mean that he was responsive, he was entitled

14  to a 2 percent cut on all of the American accounts?

15          MS. FENELON:  My client is the best but let's say

16  this.  Let's say it is a major client, right, and Franco brings

17  NSI in.  NSI have multiple service that he wants to -- NSI

18  would have multiple service needs from Seldat and let's say

19  Franco brings NSI in for warehousing and later on NSI decides

20  to ask for staffing.

21          Those new accounts, Franco would have 2 percent of

22  that.  That's what I mean to say.

23          THE COURT:  And what about let's take NSI out of the

24  picture, let's propose client X who was already a Seldat client

25  for, let's say, warehousing before Mr. Franco got there.  Would

IC55skiC                        conference

1    Mr. Franco be entitled to any commission on client X?

2              MS. FENELON:  If he did not bring the client in and is

3    not working with the client, no.

4              THE COURT:  And how do you tell if he is "working with

5    the client?"

6              MS. FENELON:  He would introduce the client and then

7    that client would provide service.

8              THE COURT:  Right.

9              MS. FENELON:  Would request additional service, then

10   that's the additional new account.

11             THE COURT:  Does it matter who the client called up

12   when the client asked for additional service?  Does it matter

13   whether the client called Mr. Franco or called Mr. Dadoun?

14             MS. FENELON:  Yes, it would matter.

15             THE COURT:  So, if his relationship was with

16   Mr. Franco and Mr. Franco was the one he called up and said,

17   Joseph, *I would like to expand my services that I purchase from*

18   *Seldat,* then it would be 5 percent to Mr. Franco?

19             MS. FENELON:  2 percent, because it was 5 percent

20   already, 2 percent for additional services.

21             THE COURT:  I think that's different from what you

22   told me a moment ago.  It is possible that I'm the person who

23   is confused now but I thought you started out by telling me

24   that it was 2 percent on add-on services that were not directly

25   requested from Mr. Franco.

IC55skiC                      conference

MS. FENELON:  No, your Honor.  I apologize.

If a customer, if Franco brings in a customer for a particular service, he is entitled to 5 percent of that.

THE COURT:  Correct.  I mean correct, I follow you.

MS. FENELON:  If that customer later on requested additional service and Franco is the one that he is asking the service from, managing that service, he is entitled to 2 percent.

THE COURT:  And if the customer asks for additional services from Mr. Dadoun or someone else, that's --

MS. FENELON:  That's the sales person for that service.

THE COURT:  And that's what the company meant by maintenance accounts.

MS. FENELON:  Maintenance account.

And also I would say, your Honor, you did give an example earlier, you said that if Franco had nothing to do at the beginning with a customer and the customer requests additional service from Franco, Franco would be entitled to that 2 percent even though he wasn't the one to bring it.

THE COURT:  So, if customer X was already a Seldat customer before Mr. Franco got there but Mr. Franco gets to know the customer, the customer trusts Mr. Franco, the customer calls Mr. Franco up directly and says I would like to expand into staffing --

IC55skiC                    conference

1          MS. FENELON:  It was more likes a sales pitch.  Franco

2     would go have to sell the services.

3          THE COURT:  So Franco calls the customer.

4          MS. FENELON:  Yes; this is what we have to offer,

5     would you like to come?

6          THE COURT:  And in your view he would get 2 percent on

7     that additional business?

8          MS. FENELON:  Yes.

9          THE COURT:  From an existing customer.

10          MS. FENELON:  That's what I understand from my client

11     but he is the best to explain it.

12          THE COURT:  And the evidence of your view of what the

13     contract meant will be Mr. Dadoun's testimony and the testimony

14     of your other witnesses, correct?

15          MS. FENELON:  Yes.

16          THE COURT:  Do you have any other documentary

17     evidence, e-mails for example, that are consistent or

18     supportive of your view of what the contract actually was?

19          MS. FENELON:  It's the customer of the company, that's

20     how they pay their sales person and how they envision the

21     company and business.  So, I don't believe I have more than

22     their testimony.

23          THE COURT:  So it is just testimony?

24          MS. FENELON:  Yes.

25          THE COURT:  Okay.  These cases are difficult where it

IC55skiC                      conference

1     is he-said-he-said.

2                   MR. MUI:  Yes.

3                   THE COURT:  And there is no documentary evidence that

4     really leans heavily one way or the other.  Let's see if I had

5     any other questions...

6                   On the defamation claim, the plaintiff's claim for

7     defamation, I understand Mr. Dadoun sent out an e-mail that was

8     fairly uncomplimentary of Mr. Franco and sent it, as I

9     understand it, to a group of customers.

10                  MS. FENELON:  His customers, yes.

11                  THE COURT:  The defenses are, first, Ms. Fenelon, the

12    common interest privilege.  Explain what the common interest

13    was there.

14                  MS. FENELON:  The customer was Seldat customers and

15    Franco -- Daniel Dadoun sent an e-mail after Franco sent an

16    e-mail to all these customers.  I think I explain it better in

17    my proposed conclusion of law but the customers belonged to

18    Seldat and Daniel was acting as the CEO of the company to undo

19    the damages done by Franco when he sent the e-mail the day

20    before.

21                  THE COURT:  That's not the common interest privilege.

22    The common interest privilege is a qualified privilege that may

23    protect otherwise actionable defamatory statements if they are

24    made among and between people who are similar are similarly

25    situated and need the information for a similar reason.  For

IC55skiC                    conference

1    example, some of the classic situations in which you see the

2    common interest defense asserted, if a group of managers is

3    considering whether to hire someone, information about that

4    someone can be circulated among them because they need it do

5    their job.  If the members of a college admissions committee

6    are meeting to determine whether to admit an applicant, they

7    have a common interest.  If the members of a board of directors

8    are considering some business deal as to which they need to

9    evaluate somebody's credibility or character or what have you,

10   they have a common interest.

11           What is the common interest between the defendant

12   corporation and its CEO Mr. Dadoun and that corporation's

13   customers?

14           MS. FENELON:  The common interest is the business,

15   they do it together.  It is that the service they're

16   providing -- the customer needs the service and Seldat is the

17   one providing those services and the action from Franco would

18   endanger that service.

19           THE COURT:  Okay.

20           Turning to the counterclaims, your first counterclaim

21   is for recovery of overpaid commissions in the amount of

22   $600,000.  Can you give me your elevator speech on how you

23   calculate that and what might have prompted your client to

24   overpay and not notice?

25           MS. FENELON:  According to my client he, the

IC55skiC                    conference

1    commission was set based on expected sales that a sales person

2    would bring in and there was a draw that was given out.

3                THE COURT:  The draw was $144,000 a year.

4                MS. FENELON:  Yes, and it is based on expected sales

5    and, according to my client, he pays Franco based on promises

6    that he is going to bring sales and the sales that Franco

7    brought in do not equate to the commission that he paid him and

8    so that's why he became overpaid.

9                THE COURT:  Over the four years, approximately, that

10    the relationship persisted, how much above and beyond his draw

11    did Mr. Franco actually get paid?

12                MS. FENELON:  I don't have that information.  It is

13    about five hundred something, probably.

14                THE COURT:  So that's the entire amount that you are

15    now trying to claw back, everything above the draw?

16                MS. FENELON:  Say that again, please?

17                THE COURT:  Well, his draw was $12,000 a month or

18    $144,000 a year, correct?

19                MS. FENELON:  Yes.

20                THE COURT:  And you are saying he was paid commission

21    above that in the amount of over $500,000 which also is roughly

22    the amount that you now say you are entitled to get back.  Are

23    you saying that Mr. Franco didn't earn any commission that

24    cleared his draw?

25                MS. FENELON:  Not any.  He was paid about $1.3 million

IC55skiC                        conference

1    or $1.4 million.

2            THE COURT:  Of which you wish to get back $572,000.

3            MS. FENELON:  Yes.

4            THE COURT:  Which suggests to me that he was entitled

5    to be paid about $900,000.

6            MS. FENELON:  Yes.

7            THE COURT:  Which about $600,000 of which was his draw

8    over four years and a couple of extra thousand -- I am doing

9    rough math in my head -- must have been commission above the

10   draw, right?

11           MS. FENELON:  I'm sorry, your Honor?

12           THE COURT:  I am sorry if I am not being clear.

13           Your view of the world is that the draw was a draw

14   against commission, correct?

15           MS. FENELON:  Yes.

16           THE COURT:  That he didn't start getting commission

17   checks until his 5 percent or his 2 percent, whatever the case

18   may be, added up to more than his draw, right, like an advance

19   on a novel?

20           MS. FENELON:  Yes.

21           THE COURT:  You don't start getting royalty payments

22   until you have earned your advance and Mr. Franco, in your view

23   of the world, didn't start getting commission payments until he

24   had heard more than he was getting his draw.

25           MS. FENELON:  My, just so I can be clear, my view of

IC55skiC                    conference

1  the world is that we -- Seldat -- paid him $1.something million

2  dollars.  500 K of that he did not earn.

3           THE COURT:  I understand that.  But if he didn't earn

4  500 K of 1.4 then he did earn 900,000.

5           MS. FENELON:  Remaining.

6           THE COURT:  Roughly.

7           MS. FENELON:  Yes.

8           THE COURT:  Which is more than his draw.

9           MS. FENELON:  Yes.

10          THE COURT:  So he must have earned some commission

11  above and beyond his draw.

12          MS. FENELON:  Yes.  Based on --

13          THE COURT:  And what you are telling me, I assume, is

14  that your client, through Mr. Dadoun, somehow never actually

15  did the math during the entire four years that Mr. Franco was

16  there and just wrote, what, estimated checks?

17          MS. FENELON:  No, your Honor.  That's not what I'm

18  saying.

19          THE COURT:  What calculation was done?

20          MS. FENELON:  Yes.  The calculation was done but there

21  was a situation where Franco was involved in setting -- they

22  had some kind of relationship where my client will be the

23  benefit to explain that, your Honor.

24          THE COURT:  Well, because he hasn't explained it in

25  his affidavit.  That's why I am asking you.

IC55skiC                    conference

1        MS. FENELON:  I don't believe he -- I don't believe he

2   did not calculate any number and I think --

3        THE COURT:  How is he going establish at trial that he

4   is owed $572.960.71 back?

5        MS. FENELON:  I think he believes it is based on the

6   commission that he paid.

7        THE COURT:  Sure, but he is going to have to show us

8   the math, you know.  Is he going to be able to do that?  Client

9   by client, percentage by percentage?

10       MS. FENELON:  That's what his position is, your Honor,

11  so I assume that he is going to be able to show it.

12       THE COURT:  But you don't know what it is based on as

13  we sit here today.

14       MS. FENELON:  No, your Honor.

15       THE COURT:  Okay.  There is a defamation counterclaim

16  as well and the defamation counterclaim is based on the

17  plaintiff publishes his original complaint in this action, not

18  publishing by filing it on ECF, but publish it by I guess

19  sending it around town to customers.  The plaintiff alleged

20  that that is privileged because it was in a complaint.  You

21  understand there is case law to the effect that what you say in

22  the complaint is privileged but if you then put your complaint

23  on Facebook or on e-mail or in the newspaper rather than

24  waiting for some enterprising journalist to do that for you,

25  that you lose the privilege.

IC55skiC                    conference

1              You are aware of that risk, right?

2              MR. MUI:  I'm aware now.

3              THE COURT:  Okay.  Simply putting it in a complaint

4    the first time doesn't give you carte blanche.

5              MR. MUI:  Understood.

6              THE COURT:  To republish it and to put the rest of the

7    world under protection privilege.

8              MR. MUI:  Understood.

9              THE COURT:  So, you have some risk there.  The most

10   potentially defamatory statement in the original complaint was

11   the allegation, and let me see if I have this straight, that

12   Seldat itself was behind a theft of goods from complainant's

13   warehouse.

14             MR. MUI:  Yes.

15             THE COURT:  Is that the allegation.

16             MR. MUI:  Yes.

17             THE COURT:  Is it true?

18             MR. MUI:  Is it a true statement that Seldat was

19   behind that?

20             THE COURT:  Yes.  How are you going to prove it, in

21   other words.

22             MR. MUI:  Through testimony.

23             THE COURT:  Because you have to -- I mean,

24   technically, Ms. Fenelon has to prove that it is false because

25   falsity is an element of a defamation claim but particularly in

IC55skiC                       conference

1    a bitch of trial we will certainly expect to see evidence of

2    truth from the defendant, or in this case the

3    counter-defendant.

4              MR. MUI:  We would offer testimony from Mr. Franco.

5              THE COURT:  Does he have any firsthand knowledge of

6    that?

7              MR. MUI:  Firsthand?

8              THE COURT:  What happened in that warehouse.

9              MR. MUI:  He was informed as to what happened at the

10   warehouse.  Did he see it happen?  No.

11             THE COURT:  If he was informed as to what happened to

12   the warehouse that may potentially, depending on how it is

13   presented, be admissible as to malice.

14             MR. MUI:  Right.

15             THE COURT:  But not as to the truth of the matter

16   asserted.

17             MR. MUI:  Right.

18             THE COURT:  So how are you going to prove, if you

19   think you can, that those statements were true?

20             MR. MUI:  There was no other avenue, Judge, sitting

21   here today, where I could offer a document or other testimony

22   that would substantiate the truth of that other than what

23   Mr. Franco would have to offer.

24             THE COURT:  The person who told Mr. Franco that is not

25   on your witness list?

IC55skiC                       conference

1      MR. MUI: No. No.

2      THE COURT: And Ms. Fenelon, how are you going to

3 prove that statement was false?

4      MS. FENELON: First, my witness will tell that you he

5 wasn't arrested and there were no thefts.

6      THE COURT: And there was no theft or the theft was

7 not committed.

8      MS. FENELON: There was no theft as well either. The

9 theft was not committed by Seldat either, if there was one, but

10 there was no theft.

11      THE COURT: It wasn't my dog, and if it wasn't my dog

12 he wasn't in your yard. If he was in your yard, he didn't dig

13 that hole.

14      MS. FENELON: There was no arrest, there are no --

15      THE COURT: I will assume that Mr. Dadoun is competent

16 to testify about whether he was ever arrested. Is he competent

17 to testify about whether there was a theft after at a

18 warehouse?

19      MS. FENELON: Yes, he is.

20      THE COURT: Does he have firsthand knowledge?

21      MS. FENELON: He would because he was the CEO and he

22 was involved with the operation, and also one of my witness is

23 involved in the operation as well.

24      THE COURT: So one of your --

25      MS. FENELON: Two of my witnesses.

IC55skiC                      conference

1          THE COURT:  So, two witnesses will speak to that

2     point.

3          Turning back to plaintiffs again who are counterclaim

4     defendants as to this point, what is the basis for the claim

5     that Mr. Dadoun was arrested?

6          MR. MUI:  Again, Judge, it was information provided to

7     Mr. Franco.  I can't speak as to why that allegation was made

8     in the amended complaint, that was made by predecessor counsel.

9          THE COURT:  I see that is not made in the current

10    complaint.

11         MR. MUI:  Right.  Other than what Mr. Franco was

12    informed of.  I don't know how deep you want to get into the

13    facts here but.

14         THE COURT:  Well let's assume, hypothetically

15    speaking, that the only testimony on the truth of the matter

16    comes from Mr. Dadoun and he says I was never arrested and

17    there is no testimony or other admissible evidence on that

18    point.  So now your client has made a false statement.

19         MR. MUI:  Right.

20         THE COURT:  And since Mr. Dadoun is not a public

21    figure, at least there is no such allegation that's been made

22    in this case, it is essentially a negligence standard, common

23    law defamation.

24         MR. MUI:  Right.

25         THE COURT:  So, what is your client's defense to

IC55skiC                        conference

 1   making this defamatory per se charge, which let's presume for

 2   purposes of this conversation, turns out not to be true and

 3   unquestionably is well calculated to damage his business

 4   reputation?

 5        MR. MUI:  Well, I think if you heard the circumstances

 6   surrounding why Mr. Franco sent that e-mail with his complaint

 7   attached he was getting calls from clients of his saying what's

 8   going on there?  Are you involved with any of this?  There is

 9   products missing and, you know, you work there.  What is going

10   on?

11        THE COURT:  I am not aware of any case law or other

12   precedent for the proposition that you are allowed to commit

13   defamation when you are under siege.  Are you?

14        MR. MUI:  No.

15        THE COURT:  So let's stick to the actual defamation

16   charge.

17        MR. MUI:  Initially, Judge, our defense was going to

18   be that these were allegations made in the complaint, that

19   clearly I need to do a little more research on that portion of

20   it now after your instruction earlier today.  I don't have,

21   other than truth and allegations made in the complaint, I don't

22   have another defense.

23        THE COURT:  You may want to give that some thought.

24        MR. MUI:  Yes.

25        THE COURT:  Turning back to the

IC55skiC                              conference

1    defendant/counterclaimant on this defamation issue, what are

2    your damages, Ms. Fenelon?

3              MS. FENELON:  Damages, as I cited in my proposed

4    conclusion of law, is that defamation per se, when you accuse

5    someone, make a false statement about, like accuse someone of

6    criminal activities, damage doesn't necessarily be played there

7    but --

8              THE COURT:  But that means I would have discretion to

9    award damages in a nominal amount.  So, if you want more than

10   that, it would be helpful if you actually had some loss of

11   business or something concrete.

12             MS. FENELON:  Why.  So, a lot of our customers have

13   walked away from us, and I said ours because I am in-house

14   counsel that's why I say "ours."

15             THE COURT:  I understand.

16             MS. FENELON:  A lot of our customers have walked away

17   or some of them actually claim they don't want to pay us and

18   claim that we have been told about your policy or they are

19   actually removing themselves from us.  So, we have lost a lot

20   of business from that.

21             THE COURT:  And you can tie that to this particular

22   e-mail?

23             MS. FENELON:  Some of these customers are from our --

24             THE COURT:  My point is you do have to connect the

25   dots.  You can't say every account that we lost since that

IC55skiC                      conference

1    e-mail was sent must have been as a result of that e-mail.

2            MS. FENELON:  No, your Honor.

3            THE COURT:  Or that distribution of the complaint.

4            MS. FENELON:  That's what I would be attempting to

5    prove.

6            THE COURT:  You have to show causation.

7            MS. FENELON:  Yes.

8            THE COURT:  And not perfect evidence but reliable

9    evidence as to the amount of the loss, not in revenue but in

10    profit, if that's going to be the allegation, that you lost

11    profits on account of this.

12            Anything else I haven't covered, plaintiffs?

13            MR. MUI:  Nothing.

14            THE COURT:  Defendants?

15            Well, this discussion was helpful to me.  It gave me

16    some ideas both for the questions the Court may want to ask at

17    trial and it is my practice to, after the lawyers have asked

18    their questions to, in a bench trial, I will ask the witness

19    some questions myself so just be aware of that.  It gives me

20    some help in what to look out for in the testimony and in the

21    documentary evidence, and I hope it may have started the

22    parties thinking about sensible ways in which this dispute may

23    be settled before we start at 11:30.

24            MR. MUI:  Judge, I just have one question.

25            If we go back and do research on certain issues that

IC55skiC                      conference

1    your Honor raised today, would we be permitted to amend our

2    proposed findings of fact and law?

3              THE COURT:  At the conclusion of the evidence I will

4    allow the parties to make a pitch to me for that and we will

5    see where we are, at that point, in terms of whether anything

6    truly new has come up that would warrant a supplement.

7              MR. MUI:  Okay.

8              THE COURT:  Anything further today?

9              MR. MUI:  No, thank you.

10             THE COURT:  Ms. Fenelon?

11             MS. FENELON:  No.

12             THE COURT:  All right.  What time deadlines did I give

13   you?  Ms. Fenelon, you are going to serve your supplemental

14   deposition excerpt by Friday.

15             MS. FENELON:  By Friday, yes.

16             THE COURT:  And the plaintiffs are going to make any

17   objections that they have no later than --

18             MR. MUI:  Wednesday.

19             THE COURT:  Right.  When you get to court at 9:30 on

20   Wednesday morning and you can put that in writing in the way

21   you have done in the original joint pretrial statement, please,

22   with a little, you know, a little chart.

23             MR. MUI:  Yes, Judge.

24             THE COURT:  And then at 9:30 we will convene with no

25   court reporter and see where we are settlement-wise.  And at

IC55skiC                          conference

1    11:30, if we can't settle the case, we will go on the record

2    and we will try the case, beginning with Mr. Franco as the

3    first witness.

4              MS. FENELON:  And you want us to submit binders by

5    Tuesday?

6              THE COURT:  Yes.  I want you to send the binders to

7    chambers by close of business Tuesday, earlier if you can.

8    Please make an effort to consolidate so there is just one

9    binder and not two because, otherwise, we waste time looking

10   for the right binder.

11             Thank you very much, ladies and gentlemen.

12                              o0o

13

14

15

16

17

18

19

20

21

22

23

24

25